1

2

3

4

5

6

7

8             **UNITED STATES DISTRICT COURT**

9             **EASTERN DISTRICT OF CALIFORNIA**

10

11   LUIS VALDEZ, an individual,                    Case No. 1:21-cv-00118 JLT SAB

12                  Plaintiff,                       ORDER GRANTING DEFENDANT'S
                                                     MOTION FOR SUMMARY JUDGMENT
13         v.
                                                     (Doc. 21)
14   FORD MOTOR COMPANY,

15                  Defendant.

16

17          Luis Valdez purchased a Ford pickup truck that he asserts was defective due to "steering/

18   suspension issues, coolant leak, and shuddering." (*See* Doc. 1-2 at 4.) Valdez seeks to hold Ford

19   Motor Company liable for violations of California's Song-Beverly Consumer Warranty Act,

20   asserting breaches of implied and express warranties. (*See generally* Doc. 1-2.) Ford Motor

21   Company seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

22   (Doc. 21.) Valdez opposes the motion, asserting there are triable issues of fact. (Doc. 24.) For the

23   reasons explained below, the motion is **GRANTED**.

24   **I.      Factual Background[1]**

25

26   ───────────────
     [1] This section is a summary of the undisputed facts as well as the parties' contentions in the matter. The parties failed
27   to file a joint statement of undisputed facts and instead filed separate statements of undisputed facts. Facts prepared
     by Valdez that were either admitted by Ford, did not have any evidence to support the dispute, or were not disputed
28   by the evidence are identified as "PUF" for Plaintiff's undisputed facts. (Doc. 24-19.) Likewise, facts prepared by
     Ford that were either admitted by Valdez, did not have any evidence to support the dispute, or were not disputed by
     the evidence are identified as "DUF" for Defendant's undisputed facts. (Doc. 25-6.)

1    Luis Valdez purchased a 2017 Ford F-250 6.7 Super Duty pickup truck on November 22,

2    2017. (Doc. 21 at 8; DUF 1.) Valdez purchased this vehicle to help him tow a trailer for his

3    movable taco business "Tacos El Viejon." (DUF 33-34; Doc. 21-7 at 4-5, Valdez Depo. 28:5-

4    29:3.) Valdez alleges he received a "lemon," and that despite presenting the vehicle at an

5    authorized Ford repair facility multiple times, Ford was unable to repair the vehicle. (Doc. 24 at

6    21.) Valdez further alleges he was unable to tow the trailer, which resulted in having to

7    permanently close Tacos El Viejon. (DUF 36.)

8    Valdez asserts he requested that Ford buy-back his vehicle, as required under the Song-

9    Beverly Warranty Act, but Ford refused to "refund the price paid." (Doc. 1-2 at 8.) Ford disputes

10   his assertion that the company refused to buy back the vehicle. (*See* DUF 50-53.) Valdez

11   presented the subject vehicle to a Ford dealer a total of six times. (DUF 10, 14, 21.) However,

12   only four of these presentations are relevant to the alleged nonconformities giving rise to this

13   case.[2]

14   Valdez presented his vehicle for repairs at Heritage Ford on December 2, 2019, at which

15   time the odometer read 25,579 miles. (DUF 17.) Valdez complained that "while driving at

16   highway speeds and hitting uneven pavement vehicle shakes a lot." (DUF 18.) He also reported

17   he had "to press brake pedal too far down." (DUF 10(i).) The maintenance order shows the tech

18   installed a new damper to address the prevent further shaking but was unable to verify Valdez's

19   concern with the breaks. (Doc. 21-10 at 2.)

20   On December 20, 2019, Valdez contacted Ford's customer service. (DUF 50.) Though

21   Valdez does not remember the conversation with Ford's customer service (DUF 49), the call log

22   maintained by Ford shows the customer service specialist noted: "advised that [I] can provide

23   buyback he declined." (DUF 50.) Valdez disputes that Ford made a buyback offer and states that

---

24   [2] Valdez presented his vehicle to a Ford dealership for repairs on January 11, 2019, approximately 13 months after

25   the purchase date. (DUF 15.) However, per Valdez's response in a request for admission, the first time he presented
     his vehicle for an alleged nonconformity giving rise to this case was when the mileage on the vehicle was at 25,579.

26   (DUF 16.) This mileage coincides with the repair order dated December 2, 2019. (DUF 17.) Requests for admission
     are binding on the parties. *Conlon v. United States*, 474 F.3d 616, 622 (9th Cir. 2007); *see also, Dennis A. Rockwell,*

27   *et al. v. Air & Liquid Sys. Corp., et al. Additional Party Names: ASCO, L.P., Dawn Rockwell*, No. CV 21-3963-
     GW-PLAX, 2022 WL 2784395, at *4 (C.D. Cal. May 20, 2022) ("admissions resulting from requests for

28   admissions are binding and cannot be explained away or contradicted [sic] by other evidence"). The Court will
     therefore not consider the January 11, 2019 presentation.

2

he "made an affirmative request for a repurchase." (DUF 50.) The call log shows that Valdez requested a buyback on December 20, 2019, but when he was offered one by the customer service agent, he declined. (*Id.*; Doc. 21-13 at 9.) This does not contradict Ford's statement and therefore does not create a genuine issue of material fact.

Valdez contacted Ford's customer service once again on December 30, 2019. (DUF 51.) Valdez again disputes that a buyback offer was made and argues that "Ford cannot credibly argue but does argue that Ford offered Plaintiff a repurchase of the vehicle although its corporate representative testified that Ford never evaluated the vehicle to determine if it qualified for a repurchase." (*Id.*) However, the call log indicates Valdez was offered a buyback but "he denied because he wants 100% refund on his vehicle." (*Id.*; Doc. 21-13 at 13.) This is consistent with Ford's assertion, and therefore Valdez does not create a genuine issue of material fact.

On June 22, 2020[3], Valdez presented the vehicle at Swanson-Fahrney Ford. (DUF 10(ii).) Valdez complained that "when [the] steering wheel is turned the left and you move [the] steering wheel back and forth there is a ticking knocking noise." (*Id.*) In response, the tech "[v]erified noise checked front end didn't find anything loose compared with same year vehicle. Vehicle makes same noise. Normal characteristic of vehicle." (*Id.*)

On September 11, 2020, Valdez presented his vehicle to Price Ford of Turlock and complained of a "front end wobble." (DUF 10(iii).) The technician verified Valdez's concern and installed a new draglink, a new steering damper, and a new track bar. (*Id.*) The technician then test drove the vehicle and "found no pull and vibration is gone when hitting bumps. Ok at this time." (*Id.*)

On October 28, 2020, Valdez presented his vehicle to Rush Truck Center and complained of a "noise in steering wheel." (DUF 10(iv).) The technician indicated: "Road tested could not verify the concern. Did not hear any abnormal noises. Compared to like vehicle and has same normal noises." (*Id.*) Valdez did not make any complaints regarding the shaking or front-end

---

[3] Valdez presented his vehicle at Heritage Ford on April 3, 2020. (DUF 21.) The Court will not consider the April 3, 2020 repair order for purposes of the instant motion. Ford requested that Valdez "identify the alleged 'nonconformities' and the dates they were presented" during discovery. (DUF 9.) Valdez's response did not include the repair orders dated January 11, 2019 or April 3, 2020. (*Id.*) Valdez verified his responses on December 13, 2021. (*Id.*) Valdez has neither amended nor supplemented his discovery responses. (*Id.*)

1   wobble that had previously been repaired. (*See id*.) The repair order states the odometer read

2   33,917. (DUF 27.[4]) This was the last time Valdez presented the vehicle to an authorized repair

3   facility. (DUF 28.)

4       Each of the above repairs were covered under the vehicle's warranty. (DUF 11.) The

5   express warranties, which can be found in Ford's New Vehicle Limited Warranty, cover

6   "manufacturing defects that result in vehicle part malfunction or failure during the warranty

7   period. (DUF 4.) The express warranties do not cover parts of maintenance that malfunction due

8   to normal wear and tear. (DUF 5.)

9       Ford contends Valdez did not have any issues with the vehicle after he took it to Rush

10  Truck Center in October 2020. (DUF 25.) However, Valdez asserts this is not because the

11  vehicle is in good condition, but because he did not drive the vehicle since that time. (Doc. 21-7

12  at 7.) Valdez does not recall when he last drove the truck. (DUF 30.) Valdez does, however,

13  assert that no one else drives the vehicle. (DUF 31.) Valdez filed the instant lawsuit on

14  December 21, 2020. (Doc. 1 at 1-2.) Eleven months later, Valdez registered the vehicle as non-

15  operational with California's DMV. (Doc 21-7 at 8-9.)

16      Valdez's expert, Randall Bounds, inspected the vehicle in February 2022. (DUF 32.) The

17  odometer read 35,952 at that time. (*Id*.) Thus, there were an additional 2,035 miles since Rush

18  Truck Center recorded the mileage in October 2020. Ford's expert inspected the subject vehicle

19  in June 2022. (DUF 43.)[5] Neither expert reported finding any wobbling, shaking, vibration, or

20  oscillation in the subject vehicle. (*Id*.) In bringing this motion, Ford alleges that both the repair

21  history, as well as their pre- and post- litigation efforts to repurchase the vehicle absolve them of

22  any liability under the Act.[6] (Doc. 21 at 8)

23

24  [4] Valdez disputes DUF 27 and states that the mileage listed on the repair order is not legible. However, this assertion is contradicted by the evidence, as the referenced repair order is sufficiently legible.

25  [5] Valdez purports to dispute this, and many other facts, by making legal arguments rather than identifying any conflicting evidence. His legal arguments—without supporting evidence in this action—do not create factual

26  disputes.  *See Burghardt-Cobb v. Inch*, No. 1:17-CV-01563-DAD-SKO, 2020 WL 1974264, at *1 (E.D. Cal. Apr. 24, 2020) (finding facts were undisputed where "the disputes noted by plaintiff therein are actually legal arguments…")

27  [6] Federal Rule of Evidence 408 precludes parties from introducing compromise evidence to disprove a claim's validity. Fed. R. Evid. 408 (a). However, an exception applies when a party seeks to introduce such evidence for

28  another purpose, such as "negating a contention of undue delay" as Ford does here. Fed. R. Evid. 408 (b). *See also Base v. FCA US LLC*, No. 17-CV-01532-JCS, 2019 WL 1117532, at *10 (N.D. Cal. Mar. 11, 2019).

1    **II.     Standards Governing Summary Judgment**

2           The "purpose of summary judgment is to pierce the pleadings and to assess the proof in

3    order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith*

4    *Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Summary judgment is appropriate

5    when "there is no genuine issue as to any material fact and ... the moving party is entitled to a

6    judgment as a matter of law." Fed. R. Civ. P. 56(c). In addition, a court may grant summary

7    adjudication, or partial summary judgment, when there is no genuine issue of material fact as to

8    a particular claim or portion of a claim. *Id.*; *see also Lies v. Farrell Lines, Inc*., 641 F.2d 765,

9    769 n.3 (9th Cir. 1981). The standards that apply for summary adjudication are the same as those

10   for summary judgment. *See* Fed. R. Civ. P. 56(a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d

11   1192, 1200 (S.D. Cal. 1998).

12          The moving party bears the initial burden of showing the absence of a genuine issue of

13   material fact. *Celotex,* 477 U.S. at 323. Material facts are those that "might affect the outcome of

14   the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

15   An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the

16   nonmoving party." *Id.* The moving party demonstrates summary judgment, or summary

17   adjudication, is appropriate by "informing the district court of the basis of its motion, and

18   identifying those portions of the pleadings, depositions, answers to interrogatories, and

19   admissions on file, together with affidavits, if any, which it believes demonstrates the absence of

20   a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (citation omitted); *see also Nissan*

21   *Fire & Marine Ins. Co. v. Fritz Companies,* 210 F.3d 1099, 1106 (9th Cir.2000).

22          If the moving party meets its burden, then the burden shifts to the nonmoving, opposing

23   party to demonstrate a genuine issue of material fact. *See Celotex,* 477 U.S. at 322–23. An

24   opposing party "must do more than simply show that there is some metaphysical doubt as to the

25   material facts." *Matsushita*, 475 U.S. at 587. The party is required to tender evidence of specific

26   facts in the form of affidavits, and/or admissible discovery material, in support of its contention

27   that a factual dispute exits. *Id.* at 586, n.11; Fed. R. Civ. P. 56(c). Further, the opposing party is

28   not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the

1   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

2   versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc*., 809

3   F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the

4   nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322.

5          In resolving a motion for summary judgment, the Court may consider only evidence that

6   may be admissible at trial. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002)

7   (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc*., 854 F.2d 1179, 1181 (9th Cir.

8   1988)). Further, evidence must be viewed "in the light most favorable to the nonmoving party"

9   and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr*, 285 F.3d at

10  772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

11  **III.    Discussion and Analysis**

12         Ford asserts Valdez is unable to succeed under California's Song-Beverly Consumer

13  Warrant Act, asserting summary adjudication is appropriate for the alleged breaches of both the

14  implied warranty and express warranty. (*See generally* Doc. 21 at 13-30.) Valdez opposes the

15  motion, asserting Ford failed to meet its burden as the moving party and there are genuine issues

16  of material fact. (*See* Doc. 34 at 8-23.)

17         A.    The Song-Beverly Warranty Act

18         California enacted the Song-Beverly Act in 1970 to "protect individual consumers."

19  Stats.1970, ch. 1333, § 1, p. 2478; *Park City Servs., Inc. v. Ford Motor Co.*, 144 Cal. App. 4th

20  295, 306 (2006). It regulated "warranty terms, impose[d] service and repair obligations on

21  manufacturers, distributors, and retailers who make express warranties, require[d] disclosure of

22  specified information in express warranties, and broaden[ed] a buyer's remedies to include costs,

23  attorney's fees, and civil penalties. It supplements, rather than supersedes, the provisions of the

24  California Uniform Commercial Code." *Krieger v. Nick Alexander Imports, Inc.*, 234 Cal. App.

25  3d 205, 213 (1991) (internal citations omitted).

26         B.    Implied Warranties

27         Valdez seeks to hold Ford liable for a breach of the implied warranty of merchantability

28  under the Song-Beverly Act. (Doc. 1-2 at 2, 6.) The Act provides that "every sale of consumer

goods that are sold at retail in this state shall be accompanied by the manufacturer's and retail seller's implied warranty that the goods are merchantable." Cal. Civ. Code § 1792.  The implied warranty of merchantability requires that "consumer goods:"

> (1) Pass without objection in the trade under the contract description.

> (2) Are fit for the ordinary purposes for which such goods are used.

> (3) Are adequately contained, packaged, and labeled.

> (4) Conform to the promises or affirmations of fact made on the container or label.

Cal. Civ. Code, § 1791.1. Goods are merchantable if they are fit "for the ordinary purpose for which such goods are used." *Mexia*, 174 Cal. App. 4th at 1303. "Such fitness is shown if the product 'is in safe condition and substantially free of defects.'" *Id*. As applied to vehicles, the implied warranty of merchantability is intended to "protect[] not only the vehicle purchaser, but other motorists, passengers, pedestrians, and the public generally." *Brand v. Hyundai Motor Am.*, 226 Cal. App. 4th 1538, 1547(2014), *as modified on denial of reh'g* (July 16, 2014).

"Unlike express warranties, which are basically contractual in nature, the implied warranty of merchantability arises by operation of law." *Am. Suzuki Motor Corp. v. Superior Ct.*, 37 Cal. App. 4th 1291, 1295 (1995). "It does not impose a general requirement that goods precisely fulfill the expectation of the buyer. Instead, it provides for a minimum level of quality." *Id.* at 1296. (citation and internal quotation marks omitted).

Defects that do not "compromise the vehicle's safety, render it inoperable, or drastically reduce its mileage range" do not impact a vehicle's merchantability. *Troup v. Toyota Motor Corp.*, 545 Fed. App'x 668, 669 (9th Cir. 2013).  However, "California courts 'reject the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied warranty of merchantability. A vehicle that smells, lurches, clanks, and emits smoke over an extended period of time is not fit for its intended purpose.'" *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 946 (C.D. Cal. 2012). A "merchantable vehicle under [the Act] requires more than the mere capability of 'just getting from point 'A' to point 'B.'" *Brand*, 226 Cal.App.4th at 1546.

Ford asserts Valdez's claim for a breach of the implied warranty fails for three reasons: (1) the "implied warranty only applies to 'consumer goods' not to the Valdez's business use of the vehicle;" (2) if any breach occurred, it was after the one-year warranty expired; and (3) "[t]here is no evidence that the vehicle was unfit for its ordinary purpose." (Doc. 21 at 14.)

1.    Applicability to Consumer Goods

As an initial matter, the parties disagree on whether the definition of "consumer goods" or the definition of "new motor vehicle" applies to implied claims under the Act. Ford argues that Valdez's claim as to the implied warranties fail because Valdez used his vehicle for business purposes, which is not permitted under the definition of "consumer goods." (Doc. 21 at 14.)

Valdez asserts that implied warranties under the Act use the definition of "new motor vehicle" found in Cal. Civ. Code § 1793.22. (Doc. 24 at 5.) This includes "vehicles bought or used for personal, family, or household purposes but it also includes vehicles bought or used for business purposes." (*Id*. at 5.) While Valdez asserts that "Ford ignores controlling authority that is dispositive" of which definition applies to implied warranties, he only cites to the definition of new motor vehicle in Cal. Civ. Code § 1793.22(e)(2) and does not refer to any case law addressing the statutory provisions. (Doc. 24 at 12-13.)

In its response, Ford argues Cal. Civ. Code § 1793.22 applies only to *express* warranties and not to *implied* warranties. (Doc. 25 at 6-8.) Ford argues that Valdez "omits the beginning of subdivision (e) which makes clear that the definition of 'new motor vehicle' in (e)(2) only applies '[f]or purposes of subdivision (d) of § 1793.2 and this section.'" (Doc. 25 at 7.) Ford further argues that "subdivision (d) of § 1793.2 only applies to 'service or repair [of] the goods to conform to the applicable *express warranties*.'" (*Id.* (emphasis in original).)  In support of this position, Ford cites to *Victorino v. FCA UC LLC*, No. 16Cv1617-GPC(JLB), 2020 WL 2306609, fn. 3 at *4 (S.D. Cal. May 8, 2020), which states that "[f]or the purposes of implied warranties, the Song-Beverly Act applies only to 'consumer goods.'" (Doc. 21 at 14; Doc. 25 at 20.) Valdez does not address *Victorino*.

In *Edmonson v. LCW Auto. Corp.*, No. CV073303CASVBKX, 2008 WL 11338640, (C.D. Cal. Mar. 10, 2008), plaintiffs leased a new vehicle for business purposes. Shortly thereafter,

8

1    Plaintiffs filed suit, alleging that "the vehicle was defectively manufactured, designed, and/or

2    assembled, and that defendants [] breached express and implied warranties by failing to repair

3    the vehicle." *Id.* at *1. The court dismissed the claim for breach of implied warranties under the

4    Act, stating that "for purposes of implied warranties, the Song-Beverly Act applies only to

5    'consumer goods," which are defined as 'any new product or part thereof that is used, bought, or

6    leased for use primarily for personal, family, or household purposes" *Id.* at *3. The court further

7    explained that "[b]ecause the vehicle is not a product that is used 'primarily for personal, family,

8    or household purposes' it is not a 'consumer good' within the meaning of the Song-Beverly Act."

9    *Id.* Accordingly, since "claims for breach of implied warranty under the Song-Beverly Act arise

10    only in regard to consumer goods, and because the vehicle is not a consumer good, plaintiff's

11    claim for breach of implied warranty under this act is not cognizable." *Id.*

12        Similarly, in *Leber v. DKD of Davis, Inc.*, 237 Cal.App. 4th 402, 409 (2015), the court

13    considered whether the vehicle in question, which was used and sold as-is, fell under the

14    definition of a "new motor vehicle" in § 1793.22. The court decided that the vehicle was not a

15    new motor vehicle and that the definition in § 1793.22(e) did not apply because "[i]f the

16    Legislature had intended the definition of 'new' vehicle in section 1793.22, subdivision (e) to

17    apply throughout the Act, it would not have explicitly limited its applicability by providing: 'For

18    the purposes of subdivision (d) of Section 1793.2 and this section, the following terms have the

19    following meaning…,' explicitly limiting the ambit of the various that followed."

20        The Court is persuaded by the reasoning in *Edmonson* and *Leber*. The language in

21    § 1793.2(e) is clear and it expressly declines to extend the definitions in that section to other

22    portions of the Act, precluding the Court from applying the definition of "new motor vehicle"

23    found in § 1793.22(e) in the instant case. *See Ruvalcaba v. Hyundai Motor Am.*, No.

24    822CV01244JWHJDE, 2024 WL 943946, at *4 (C.D. Cal. Jan. 4, 2024) ("The Song-Beverly

25    Act's implied warranty of merchantability applies to the sale of *only* "consumer goods."

26    (emphasis added)); *Chiulli v. Am. Honda Motor Co.*, No. 22-CV-06225-MMC, 2023 WL

27    5763053, at *11 (N.D. Cal. Sept. 6, 2023) ("[T]he definition of "new motor vehicle" under §

28    1793.22(e) only applies to two sections, namely, § 1793.2(d), which courts have found "only

9

applies to express warranties," and to § 1793.22, which does not reference implied warranties." (internal citations omitted)).

### 2.   Valdez's Vehicle is not a Consumer Good

Because the applicable definition is that of "consumer goods," the vehicle in question must have been purchased "primarily for personal, family, or household purposes." Cal. Civ. Code § 1791(a). Ford argues that Valdez "cannot establish that he bought or used the vehicle primarily for personal family or household purposes. [Valdez] admits that he used the vehicle for business purposes." (Doc. 21 at 14.).

Valdez asserts he "used his vehicle for personal, family, *as well as* for business purposes." (PUF 17, emphasis added.) Importantly, however, it is undisputed that Valdez purchased this vehicle for his movable taco business "Tacos El Viejon." (DUF 33-35.) During his deposition, Valdez testified his "intended purpose" of purchasing the truck was to move his business, as he needed "more power" than his other vehicle (a Ford 150) possessed.  (Doc. 21-7 at 5, Valdez Depo. 29:1-3.) Specifically, Valdez testified:

> Q.  Now, let's talk about the Ford 2 – the subject vehicle, the 250. Why did you decide to purchase the subject vehicle, the Ford 250?'
>
> A.  Because I needed more power.
>
> Q.  Okay. More power for what?
>
> A.  To move my business.
>
> Q.  And by "business," you mean the food trailer; is that correct?
>
> A.  Yes.
>
> Q.  Okay. So, were you using the Ford 150 to move the food trailer, too?
>
> A.  **That's why I bought the vehicle, due to the capacity to be able to move my business**.
>
> Q.  Right. And I understand that. I just want to confirm though, whether you used the Ford 150 to move the same trailer?
>
> A.  No.
>
> Q.  Okay, so you first starting moving your trailer when you purchased the Ford 250.

1        A.   I was renting a truck, a dually, to be able to move my business.

2        Q.   Okay. **So, would you say then that your intended purpose**
         **of getting the Ford 250 was to move your business?**

3        A.   **Yes.**

4

5   (Doc. 21-7 at 4-5, Valdez Depo. 28:5- 29:3 [emphasis added].) Valdez closed Tacos El Viejon

6   and attributes the closure of his business to an inability to tow the trailer.  (DUF 36.)

7            Based upon the uncontroverted evidence, the Court finds the primary purposes of the

8   vehicle was for business purposes, rather than a "personal, family, or household" purpose as

9   required under Cal. Civ. Code § 1791(a). Because the vehicle is not a consumer good, the Act's

10  implied warranties do not apply. Based on the foregoing, Ford's motion for summary judgment

11  as to the implied warranty claims is **GRANTED**.

12           C.       Express Warranties

13           Express warranties are terms of the parties' contract. *Keegan*, 838 F. Supp. 2d at 949.

14  The Act requires that manufacturers of consumer goods sold or leased in California make service

15  and repair facilities available to buyers where goods can be repaired to conform to any express

16  warranties provided by the manufacturer. *See* Cal. Civ. Code § 1793.2(a). In addition, the Act

17  specifies time frames for repairs under an express warranty to be provided. For example, service

18  and repair at the manufacturer's authorized repair facility in the state must be commenced

19  "within a reasonable time." *Id.* § 1793.2(b). Goods must be repaired to comply with the warranty

20  within 30 days unless a delay is caused by conditions beyond the control of the manufacturer or

21  its representative. *Id.* When a new motor vehicle cannot be repaired to conform to an express

22  warranty after a "reasonable number of attempts," the Act specifies a manufacturer must replace

23  the vehicle or pay restitution. *Id.* § 1793.2(d)(2).

24           To succeed on a claim for a breach of an express warranty under Song-Beverly, Valdez

25  must show that "(1) the vehicle had a nonconformity covered by the express warranty that

26  substantially impaired the use, value or safety of the vehicle; (2) the vehicle was presented to an

27  authorized representative of the manufacturer of the vehicle for repair; and (3) the manufacturer

28  or his representative did not repair the nonconformity after a reasonable number of repair

                                            11

1    attempts." *Rodrigues v. General Motors LLC*, No. C 23-04488 WHA, 2023 WL 8852740 (N.D.

2    Cal. Dec. 21, 2023). A single attempt to repair an alleged nonconformity cannot sustain a breach

3    for express warranties claim under the Act. *Silvio v. Ford Motor Co.*, 109 Cal. App. 4th 1205,

4    1208 (2003), *as modified* (June 19, 2003).

5         In this case, the warranties are contained in Ford's New Vehicle Limited Warranty.

6    Importantly, Ford's New Vehicle Limited Warranty only applies to manufacturing and not

7    design defects. (DUF 3.) Ford's New Vehicle Limited Warranty covers "parts of your vehicle

8    that that malfunction or fail during normal use during the applicable coverage period due to a

9    manufacturing defect in factory-supplied materials or factory workmanship." (*Id*.) The warranty

10   is meant "only to remedy manufacturing defects that result in vehicle part malfunction or failure

11   during the warranty period." (DUF 4.) Ford's New Vehicle Limited Warranty expires after three

12   years. (Doc. 21 at 20.) The warranty does not cover parts or maintenance that malfunction due to

13   normal wear and tear. (DUF 5.)

14        Ford argues that Valdez cannot succeed on an express warranty claim because: 1) there is

15   no evidence of a repeated failure to repair or replace a defective part that failed or malfunctioned

16   during the warranty period as a result of a manufacturing defect; 2) Valdez's brake system

17   concerns are unverified; 3) the front-end "wobble," oscillation, or "shake" concern was

18   successfully repaired; and 4) the noises from the steering wheel cannot support a claim because

19   the existence of abnormal noises is not verified. (Doc. 21 at 9-23.)

20              1.    Evidence of a repeated failure to replace a defective part that failed or

21                    malfunctioned during the warranty period because of a manufacturing defect

22        Ford asserts that "Valdez has no evidence of any breach of the terms of the New Vehicle

23   Limited Warranty." (Doc. 21 at 19.) Valdez argues that "California law only requires that

24   Plaintiff show a failure to conform *the Vehicle* (not the specific part, component or concern) to

25   the express warranty(ies)." (Doc. 24 at 6 (emphasis in original).)

26        The court in In *Roberton v. Fleetwood Travel Trailers of California, Inc.*, 144 Cal. App.

27   4th 785, 801 (2006) considered a similar issue. There, a defective p-trap in the vehicle caused a

28   water leak. Defendant repaired the p-trap, thereby fixing the leak, but did not address any issues

1    caused by water damage. Defendant argued that a "anytime the initial source of the
2    nonconformity is identified and repaired (e.g., repairing the leak), the manufacturer has met its
3    obligations under the Song–Beverly Act regardless of other related symptoms or harm that may
4    have resulted (e.g., damage due to water accumulation)." *Id*. The court disagreed and instead
5    found that "the mere repair of the leak in October of 2003 did not cure the entirety of the
6    nonconformity, since the resulting water damage still remained." *Id*. Based on this, the court
7    noted that it saw "no reason that a 'nonconformity' may not include an entire complex of related
8    conditions (e.g., cracked pipe *and* water damage)." *Id*. at n.11.

9        Other courts have found that "a plaintiff need not present precisely the same issue for
10   repair multiple times to be entitled to relief." *See, e.g., Aleman v. Volvo Cars of N. Am., LLC*, No.
11   CV1900831DSFASX, 2020 WL 4742814, at *7 (C.D. Cal. Apr. 15, 2020). However, "Plaintiff
12   bears the burden of establishing that one-time repairs are related to his breach of warranty claim."
13   *Arakelian v. Mercedes-Benz USA, LLC*, No. CV1809420DSFFFMX, 2020 WL 1969255, at *2
14   (C.D. Cal. Feb. 25, 2020).

15       Here, Valdez presented the vehicle on four occasions for alleged nonconformities,
16   starting in December 2019. (DUF 10.) On the first instance, Valdez complained of shaking when
17   driving at highway speeds. Valdez also complained that "he has to press brake pedal too far
18   down." (*Id*.) The technician was unable to verify Valdez's concern with the breaks and wrote
19   that they felt normal. (DUF 10(i).) During the second presentation, Valdez's chief complaint was
20   a noise when turning. (DUF 10(ii).) The technician was able to replicate the noise but wrote that
21   this was not an abnormal sound. (*Id*.) On the third visit, Valdez complained of a front-end
22   wobble. (DUF 10(iii).) The technician verified Valdez's concern and was able to repair the
23   vehicle. (*Id*.) Valdez returned to an authorized repair facility for the fourth time and complained
24   of a noise in the steering wheel. (DUF 10(iv).) The technician wrote that he did not hear any
25   abnormal noises compared to similar vehicles, which is consistent with the prior technician's
26   findings when the vehicle was first presented for the same noise. (*Id*.) After this, Valdez did not
27   present the vehicle to any authorized repair facilities or otherwise contact Ford. (DUF 28.)
28       Valdez, who bears the burden of establishing that each individual presentation relates to

1    an overall nonconformity, does not allege that these concerns are related to each other. Valdez

2    simply states that the vehicle, as a whole, must conform to the express warranties. (Doc. 24 at 6.)

3    Therefore, the Court will address each alleged nonconformity.

4                              a)        Brake System Concerns

5           Valdez raised a concern regarding the breaks on the first occasion that he presented the

6    vehicle for an alleged nonconformity giving rise to this case. (DUF 10(i).) Valdez presented his

7    concern with the breaks a singular time and the technician wrote that the "brake pedal [felt]

8    normal." (DUF 10(i).) There is no mention of any concerns with the breaks in the remaining

9    three repair orders.[7] (*See* DUF 10(ii – iv).)

10          Ford argues that Valdez's concern regarding the brakes presented during on December 2,

11   2019 is incapable of supporting a Song-Beverly claim because it was only presented once. (Doc.

12   21 at 20-21.) Critically, Valdez allege does not allege that the purported issue with the brakes is

13   related to any of the other alleged non-conformities presented.

14          In *Silvio v. Ford Motor Co.*, 109 Cal. App. 4th at 1205, plaintiff purchased a Ford

15   explorer in 1998. That same month, the vehicle "suddenly and rapidly accelerated, although

16   [plaintiff] did nothing to cause the acceleration" as plaintiff was entering his garage. *Id*. at 1207.

17   Plaintiff then presented the vehicle to Ford. *Id*. After conducting tests, Ford informed plaintiff

18   that "they could not find anything wrong with the vehicle, but that the problem was caused by

19   thick after-market floor mats he had put in the [vehicle]." *Id*. More than a year later, in July

20   2000, the vehicle suddenly accelerated again. *Id*. Plaintiff's son contacted Ford to inform them

21   that the vehicle had accelerated once again, and that Plaintiff wanted them to buy back the car

22   and was not interested in having it fixed. *Id*. Plaintiff sued when Ford refused to buy back the

23   vehicle. *Id*. The trial court dismissed the case, finding that Ford needed to have been given at

24   least two opportunities to repair the vehicle. The court of appeal affirmed, finding that "the

25   statute indicates that even where the defect if life-threatening, one opportunity is not enough."

26   *Id*. at 1209.

27   _____

28   [7] The April 3, 2020 repair order "mentions an unverified concern with the brakes." (Doc. 21 at 21.) However, as
     previously discussed, Valdez did not identify the repair order dated April 3, 2020 as one presenting an alleged
     nonconformity giving rise to this case. (DUFs 9, 21.)

                                                  14

1    Notably, the vehicle in *Silvio* only had one alleged nonconformity and it is unclear if the

2    holding on appeal applies to the *vehicle* or to the alleged nonconformity. Regardless, it is clear

3    under *Silvio* that a single presentation is insufficient.  Thus, even if the Court were to assume that

4    the alleged brake issue is a nonconformity, Ford is correct that Valdez's brake system concerns

5    cannot support a claim for breach of express warranty under the Act because it was only

6    presented a singular time and was not related to another alleged nonconformity.

7                             b)      Front-end Wobble/Oscillation Defect

8    Valdez presented the "front-end shake/'wobble' or 'oscillation" defect twice for repair.

9    (Doc. 21 at 21.)  The oscillation defect was addressed on December 2, 2019 and September 11,

10   2020. (DUF 10(i) and (iii).) The issue presented on December 2, 2019 "was repaired under

11   warranty as soon as the part became available to the dealership." (Doc. 21 at 21; PUF 15.)

12   Valdez was told he could drive the vehicle while he waited for the part to arrive. (PUF 15.) The

13   repair was completed on or around February 6, 2020. (PUF 15.) Valdez presented the vehicle

14   again for the same oscillation issue on September 11, 2020. The technician was able to replicate

15   the oscillation issue and successfully repaired it. (DUF 10(iii).) After this repair, there is no

16   indication in the service records that the vehicle continued to suffer from the same defect. In

17   fact, when Valdez presented the vehicle on October 28, 2020, he complained about a noise but

18   did not mention any continued issues with shaking or a front-end wobble. (DUF 10(iv).)

19   Valdez is unable to sustain a breach of express warranty claim under the Act based on his

20   oscillation concern. Though Valdez has sufficiently shown that there was a nonconformity in the

21   form of a front-end wobble, and that he presented the vehicle to Ford for repair more than once,

22   he cannot demonstrate that Ford *failed* to repair the nonconformity.

23   The maintenance records reflect that the oscillation issue was successfully repaired (DUF

24   10(iii), and Valdez did not complain of an oscillation issue the next time he presented the

25   vehicle for an alleged nonconformity (DUF 10(iv).  Moreover, both Valdez's and Ford's experts

26   inspected the vehicle and neither reported shaking or wobbling. (DUF 32.)

27   Furthermore, despite Valdez's testimony that he does not feel safe driving the vehicle and

28   it is currently registered as non-operational with California's DMV (PUF 12; Doc 21-7 at 8-9),

1  the evidence indicates that he drove the vehicle after the last time he presented it. The mileage on

2  the October 28, 2020 repair order is identified as 33,917. (DUF 27.) When Ford's expert test

3  drove the vehicle, the odometer read 35,952. (DUF 32.) This is a difference of 2,035 miles after

4  the last time he presented the vehicle, and a difference of 4,280 miles following the repair of the

5  oscillation issues. Valdez testified that he is the only one that has driven the vehicle. (DUF 31.)

6  This means that Valdez himself drove the vehicle for 2,035 miles since presenting it on October

7  28, 2020, yet he has not identified any continued problems with the vehicle. (*See* DUF 25-28, 32.)

8         Based on this record, the Court finds that Valdez cannot maintain a claim for breach of

9  express warranty under the Act based on the alleged oscillation nonconformity because he

10 cannot show that Ford failed to repair the defect.

11             c)    <u>Steering Wheel Noises</u>

12         Valdez presented the vehicle for a noise coming from the steering wheel on June 22, 2020;

13 September 11, 2020; and October 28, 2020. (DUF 10(ii-iv).) On the first occasion, Valdez

14 complained that "there is a ticking noise" when he "move[d] the steering wheel back and forth."

15 (*Id*. at (ii).) The technician verified the noise but noted that the "[v]ehicle makes [the] same noise"

16 as other vehicles manufactured in the same year. (*Id*.) On September 11, 2020, Valdez

17 complained of a "clunk in the steering wheel." (DUF 10(iii).) The technician noted the vehicle

18 was "ok at this time." (*Id*.) Valdez presented the vehicle again on October 28, 2020 for a "noise in

19 [the] steering wheel." (DUF 10(iv).) The technician noted that they "did not hear any abnormal

20 noises. Compared to like vehicle and has same normal noises." (*Id*.)

21         Ford argues that Valdez cannot sustain a claim for breach of express warranty under the

22 Act because "in the absence of any operational steering failure, the alleged steering noises

23 cannot qualify as a nonconformity to the warranty." (Doc. 21 at 23.)

24         The Court finds *Bezirganyan v. BMW of N. Am., LLC*, 562 F. Supp. 3d 633, 637 (C.D.

25 Cal. 2021) instructive. In *Berzirganyan*, plaintiff noticed a "squealing noise" coming from his

26 brakes. *Id*. Defendant ultimately informed plaintiff that the "squealing noises were normal and

27 that there was nothing wrong" with the vehicle. *Id*. at 637. Plaintiff filed a class action complaint,

28 alleging, amongst other claims, breach for express warranty of the Song-Beverly Act. The court

16

1    discussed the types of defects recognized by California law that could be present in a vehicle. *Id.*

2    at 640. Manufacturing defects "exist[] when an item is produced in substandard condition … Such

3    a defect is often demonstrated by showing the product performed differently from other ostensibly

4    identical units of the same product line." *Id.* In contrast, a design defect "exists when the product

5    is built in accordance with its intended specifications, but the design itself is inherently

6    defective." *Id.* (citing *McCabe v. American Honda Motor Co.*, 100 Cal. App. 4th 1111, 123

7    Cal.Rptr.2d 303 (2002)). The court concluded that "[p]laintiff clearly alleges a design defect,

8    rather than a manufacturing defect" because the brakes on "[p]laintiff's vehicle were just like the

9    [brakes] on other vehicles manufactured and distributed by [d]efendant" and did not "perform[]

10   differently than 'identical units of the same product line.'" *Id.* The *Bezirganyan* court concluded

11   that the operative complaint did not allege defects that deviated from the manufacturer's design

12   and instead "only alleges brake squeal and includes no evidence that such squeals depart from

13   Defendant's intended design." *Id.* at 640-41. The court therefore dismissed the action.

14         Like the plaintiff in *Bezirganyan*, Valdez identified a noise that he alleges is a

15   nonconformity. He has presented the alleged nonconformity three times, but it is undisputed that

16   Ford concluded that the noise is normal for vehicles of the same make and model. (*See* DUF

17   10(ii-iv).) Moreover, Valdez does not allege the noise poses a risk to the use, value, or safety of

18   the vehicle, or that the noise departs from Ford's intended design. Thus, Valdez has identified a

19   design defect, which is not covered by the terms of the express warranty.

20                          2.    Conclusion

21         Valdez fails to support all necessary elements of his claim related to an express warranty.

22   For the foregoing reasons, the Court **GRANTS** Ford's motion for summary judgment as to

23   Valdez's claims for breach of express warranty under the Act.

24   **IV.    Civil Penalties**

25         Under Song-Beverly, a buyer who establishes a willful violation of the Act may recover

26   a civil penalty of up to "two times the amount of actual damages." Cal. Civ. Code § 1794(c). As

27   discussed above, Valdez fails to establish a violation of the Song-Beverly Act. Accordingly, he

28   is not entitled to damages for these claims and the Court need not reach the issue of willfulness.

17

**V.      Conclusion**

Ford satisfies the burden to show an absence of a genuine issue of material fact, and Valdez did not show proof of all essential elements of his claims. The Court finds summary judgment is appropriate in this action. Thus, the Court **ORDERS:**

1.      Ford Motor Company's motion for summary judgment (Doc. 21) is **GRANTED**.

2.      The Clerk of Court is directed to enter judgment in favor of Ford and against Valdez and close this case.

IT IS SO ORDERED.

Dated:   **March 29, 2024**

UNITED STATES DISTRICT JUDGE